VINIA G. GREEN *vs.* E. D. SMITH & others.

Worcester.    October 6, 1897. — November 23, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & MORTON, JJ.

*Loss of Life — Employers' Liability Act — Negligence of Superintendent —
Death without Conscious Suffering — Law and Fact.*

In an action under the employers' liability act, St. 1887, c. 270, for causing the death of A., who was killed by an explosion of dynamite in a tunnel where he was at work, it appeared that, after a blast had been exploded in the tunnel, the defendant's workmen, including A. and the person who was in superintendence of the work, returned down the shaft to the tunnel, carrying dynamite with them. The only survivor of the explosion which killed A. testified that, as soon as they reached the tunnel, the superintendent told the witness to go and get the loading stick, which he did, and gave it to another workman, near whom the superintendent was standing; that A. was making connection with wires on the other side of the tunnel and in front of the superintendent; that the witness saw the dynamite placed in the holes, after which the superintendent gave them orders to go after the main wire; that the witness had gone fifteen or twenty feet when the explosion occurred; and that this was from ten to fifteen minutes after they started down the shaft. An expert witness testified that an explosion of dynamite in a hole drilled in a rock heated the rock; that it was dangerous to place dynamite in a rock which was so heated; and that, in his opinion, the second explosion was caused by the heated holes. *Held,* that it was for the jury to determine whether the superintendent was exercising superintendence.

In an action under the employers' liability act, St. 1887, c. 270, for causing the death of A., who was killed by an explosion of dynamite in a tunnel where he

was at work, two witnesses who saw A. just after the explosion testified that his leg was broken and his body was badly cut and bruised, but they did not notice whether or not he was breathing. Of three physicians, to whom hypothetical questions were put, one answered that he should say that A. died without conscious suffering, basing his opinion upon the force of the explosion; and the other two answered that they could not say whether or not A. died without conscious suffering, but on cross-examination stated that it was possible that he died instantly. One witness for the defendant, who saw A. soon after the explosion, testified that A. was laid on a pile of lumber and groaned very plainly, but did not speak, and seemed to be suffering, and he should say that he lived about twenty minutes; and another, who drove an ambulance in which A. was placed, testified that he knew A. "was alive and groaning," and, on cross-examination, that he could hear him breathing, but did not hear him say anything. *Held*, that there was evidence from which the jury might infer that A. died without conscious suffering.

TORT, under the employers' liability act, St. 1887, c. 270, for causing the death of William Green, who was the plaintiff's husband. Trial in the Superior Court, before *Dewey*, J., who allowed a bill of exceptions, in substance as follows.

Green was in the employ of the defendants, and was engaged as a laborer in the construction of a tunnel at West Berlin. This tunnel was constructed through solid rock, and was a part of a series of tunnels which the defendants were building for the Metropolitan Water Board. The tunnel was reached by a shaft sunk into the earth one hundred and twenty-seven feet, and the head of the tunnel in which the accident occurred was distant about one hundred and fifty feet from the shaft. The plan of operations was to sink a shaft the requisite depth, and then start tunnels in either direction from the bottom of the shaft. These tunnels had a flat floor and an arched roof, and were constructed by first blowing out by means of dynamite the upper half of the tunnel, leaving the lower part unblasted. The top of the tunnel, including the arch first blown out, was called the heading. The lower part of the tunnel, left unblasted until a later time, was known as the bench. The men worked in the daytime drilling holes with compressed air drills, and the blasts were made at the end of the day's work. On the day of the accident, the men, including Green, had been engaged in drilling holes for blasting into the heading. One blast had already been exploded. When a blast was exploded the men were obliged to go to the top of the shaft until after the blast. In this case, after the explosion, the men, accompanied by one Kelley, who from the evidence shown

was a foreman and in superintendence of the work, so as to make him a superintendent under the employers' liability act, returned down the shaft to the tunnel. Of the men engaged in work in the heading where the explosion occurred, only one, Thomas Foley, survived the explosion. His evidence, being the only evidence in regard to how the accident occurred, was as follows:

"We went down right soon as he pulled the battery; the foreman hollered to get into the cage and go down. The men got into the cage and we did go down. It did not take us more than four or five minutes to go down. I was a little later than the other men in getting into the heading. The first thing that happened after I got into the heading was that Kelley told me to go and get the loading stick, and he said there was one bottom hole down in the heading on the right hand side, and I went in and got the loading stick and gave it to Perry. Kelley was there; he was standing right in the heading at the left hand side near Perry. Green was making connection with wires on the other side of the heading and in front of Kelley. I saw the dynamite placed in those holes. The hole looked as though a part of it was broken off on one side. The dynamite was put in the back part of the hole. There was a cap on the dynamite. After the dynamite was put in the holes we got orders to go after the main wire to the heading. The boss, Kelley, gave us these orders. I went after the main wire. I guess I went fifteen or twenty feet. This must have been some ten or twelve or fifteen minutes after we started down from the top. I picked up the wire and just held it in my hand and was going to make the connection with another piece of wire to this piece of main wires when the explosion occurred. I had a wire in my hand at the time the explosion occurred. I was going to put another piece of wire on to it to make it long enough to take it into the heading. It had not been connected with the main wire. Then the explosion occurred. I had got away fifteen or twenty feet from Green and Perry at the time of the explosion. It took me only as long as it would take to run that distance. Green was connecting up the wires when I saw him. As a result of the explosion Green was killed, and all except me."

On cross-examination, he testified: "The gang, when they went down into the tunnel at the time of the accident, carried

some dynamite with them in their hands. Perry was carrying some. After I got the loading stick I gave it to Perry, and then I went back to fix the wires."

William Knowles, called as a witness by the plaintiff, testified that he was a sewer contractor ; that for fifteen or sixteen years he had used dynamite in his business; and that his work was mostly making house connections. The judge ruled that the witness was competent to testify as an expert. He was then asked : " In your experience, what do you say, will dynamite explode from heat ? " To which he answered : " Well, we never had any accident. If it was heated too hot it would explode, no doubt about that, though I never have seen it explode from heat." The rest of his evidence was to the effect that an explosion of dynamite in a hole drilled in a rock heated the rock ; that it was dangerous to place dynamite in a rock which was so heated ; and that, in his opinion, the second explosion was caused by the heated holes.

The evidence as to whether or not Green was instantly killed or died without conscious suffering was as follows.

Richard Miller, called as a witness by the plaintiff, testified that he was working in the other heading of this same tunnel ; that he went down into the shaft with Green, and then went to work in the east heading; that Green and the others were working in the west heading ; and that he heard the explosion. Being asked how soon he got in there, he said, " As soon as we could get into the cage and come up on top and see what caused the explosion." He further testified as follows : " We took a light and went down into the shaft and into the west heading. When we got into the west heading, we found four men blowed to the left hand side as you go in, partly covered with muck and stones. I saw Green. His leg was cut here [the witness indicating a point in the thigh, about half way above the knee] and broken, and his body was in pretty bad condition. I did not notice particularly whether he was breathing or not. I could not tell whether there were any signs of life. After we got to the top I saw Green. His leg was all torn to pieces. I did not examine him to see how he was, but I just merely looked at him. He did not seem to be very much hurt about the head. His body appeared to be cut up by stones."

Henry Stanton, called as a witness by the plaintiff, testified that he was at work at the time of the accident for the defendants ; that he knew Green and was one of the men who took him out ; that he found Green lying on the left hand side covered with muck, meaning by muck stone and dirt; that he helped to carry him out; that he found his leg broken, and he was badly bruised about his body ; that his face was not torn much ; that he did not take any notice of his breathing ; and that he did not hear him speak.

Lemuel F. Woodward, a physician, called as a witness by the plaintiff, was asked the following hypothetical question : " Suppose a man was found in a tunnel one hundred and twenty-seven feet underground, inside of ten or fifteen minutes after an explosion, covered with muck, which means stone and dirt and the débris after the explosion, that both his legs were broken, or, as one witness has put it, were shattered, cut in two places; some mentioned it, and, as one witness says, his body was full of holes, and another says badly bruised, and that there was no evidence that the man breathed or that he spoke, whether or not in your opinion the man died without conscious suffering." The witness answered that he should say that he died without conscious suffering. On cross-examination, he stated that his reason for giving this opinion was not so much the amount of muck that was on his body, but the force of the explosion ; that the fact that Green was covered with muck and his body and legs shattered showed the force of the explosion ; that he assumed that the man was killed by the force of the explosion ; that he could not say he did not live, but that there was no conscious suffering ; and that this man was evidently killed outright, and the others were injured and died.

Frederick H. Baker, a physician, called as a witness by the defendants, was asked the following hypothetical question : " Assuming that a man in a tunnel one hundred and twenty-seven feet underground is subjected to a blast of dynamite of great strength and force, that he is blown to one side of the tunnel, and that he is covered with muck which is rock blown out by the blast, that his body is badly bruised and that one or both legs are broken or shattered, as termed by one of the witnesses, that his head is not particularly bruised and that he is found

ten or fifteen minutes after the explosion, and for the purpose of this question, assume he was not breathing, and life was extinct, can you say, what do you say as an expert whether or not he lived and consciously suffered during that ten or fifteen minutes?" To this he answered, "I cannot say whether he did or did not. It is possible he suffered, and it is possible he was killed outright." He was then asked, "Is it any more possible he was killed outright than that he would suffer?" and answered, "I do not see how that question can be settled positively. It is perfectly possible he suffered during that ten or fifteen minutes." And, on cross-examination, he said it was perfectly possible that he died instantly.

Warren R. Gilman, a practising physician, was asked the following hypothetical question: "Assume that a man in a tunnel one hundred and twenty-seven feet underground is subjected to an explosion of dynamite of great force, and that he is thrown to one side of the tunnel, and a quantity of muck or loose stone is thrown on him, and he is found ten or fifteen minutes after the accident, and that at that time he is found with this muck upon him, that one of his legs is broken or badly shattered, that his body is badly bruised, that, as one witness puts it, stone is blown into his body to some extent, and that he is not particularly injured about the head. Assume that state of facts and whether you would say as a medical expert that man suffered consciously or not during the ten or fifteen minutes before." He answered as follows: "I think it is impossible to say whether he suffered or whether he did not suffer." On cross-examination, being asked if it was quite possible that an explosion of that kind would cause or deprive him immediately of his senses and his consciousness, and that he would lie there without knowing anything for those fifteen minutes, he answered that it was possible. Being asked whether or not on the hypothetical question asked in the cross-examination it was not quite probable that the man did not suffer at all, he said, "I cannot say that."

James McAtee, called as a witness by the defendant, testified that at the time of the explosion he was in the other heading, about forty feet from the shaft; that their lights were put out by the explosion; that they went on top, that is, up the shaft, and relighted their lamps; and that they then went down into

the heading where the explosion occurred. He further testified as follows : " I saw Green when he was taken out. He was lying on the left hand side of the tunnel, partly covered up by muck. He was breathing. We took him on top, and laid him out on a pile of lumber. I should say that he lived about twenty minutes. He groaned very plainly, but he did not speak. He seemed to be suffering. It seemed as though he wanted something, and could not make us understand what he did want." On cross-examination, he testified that one of Green's legs, he did not remember which, was almost cut off and only hanging; that the other appeared to be all right; that his body must have been cut up, as his clothing was torn off; that it appeared as if stones had been driven into his body ; that if holes were hot, water should be poured into the holes ; and that dynamite is likely to explode from hot holes.

James F. Maher, called as a witness by the defendant, testified that, at the time of the accident, he drove the ambulance for the town of Clinton, and went to the shaft and saw Green there ; that it might have been half an hour after the accident; and that he did not get off the seat of his ambulance, but he knew " he was alive and groaning." On cross-examination, he testified that he could hear him breathing, but did not hear him say anything; and that he took him to an undertaker's rooms, and he died on the way.

At the conclusion of the evidence, the defendants asked the judge to rule that, on all the evidence, the plaintiff was not entitled to recover; but the judge refused so to rule.

The jury returned a verdict for the plaintiff; and the defendants alleged exceptions.

*F. B. Smith, ( W. S. B. Hopkins & W. S. B. Hopkins, Jr.* with him,) for the defendants.

*C. C. Milton, (H. Parker* with him,) for the plaintiff.

ALLEN, J. There was some evidence for the jury, that the defendants' superintendent, while exercising superintendence, directed dynamite to be put into a hole while the rock was heated from the effect of a recent explosion; that under such circumstances an explosion was likely or liable to occur ; and that the explosion which followed and caused the death of the plaintiff's husband was the result of negligence on the part of

the superintendent in thus directing the dynamite to be put in before the rock had become cool. Under the circumstances of the present case, it was for the jury to determine whether the superintendent was exercising superintendence; and in this respect the case is to be distinguished from *Whittaker* v. *Bent*, 167 Mass. 588.

There was also evidence from which the jury might infer that the plaintiff's husband died without conscious suffering. The small size of that portion of the tunnel where the accident occurred, the force of the explosion as shown by its effect, the proximity of the deceased, the distance to which he and the other men were thrown, and the injuries found upon his body, supplemented by the evidence of the doctors, might lead the jury to be reasonably satisfied that the deceased was at once deprived of consciousness, and that he did not regain it, even though he may have breathed and groaned afterwards. The testimony as to these last matters may not have been accepted by the jury as absolutely accurate. The way in which the deceased was cared for by those who were rendering assistance at the time might be thought to indicate that they saw in him no signs of consciousness.

We cannot say that there was no evidence for the jury on the above points; and the other objections taken by the defendants were not insisted on at the argument.

*Exceptions overruled.*